1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   GREGORY ANTHONY POWELL,

11              Petitioner,                2: 09 - cv - 1598 - MCE TJB

12        vs.

13   D.L. RUNNELS,

14              Respondent.          FINDINGS AND RECOMMENDATIONS

15   _____/

16        Petitioner, Gregory Anthony Powell, is a state prisoner proceeding with a *pro se* petition

17   for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a

18   maximum sentence of 19 years six months after a jury convicted him on one count of attempted

19   voluntary manslaughter and one count of assault with a deadly weapon.  The jury also found true

20   the sentencing enhancements that Petitioner personally used a firearm in committing the offenses

21   and that he inflicted great bodily injury.  Petitioner raises five claims in this federal habeas

22   petition; specifically: (1) the trial court erred in admitting into evidence the victim's preliminary

23   hearing testimony when the victim was unavailable to testify at trial in violation of Petitioner's

24   right to confront the witnesses against him ("Claim I"); (2) the prosecution removed a juror based

25   on the juror's race in violation of *Batson v. Kentucky*, 476 U.S. 79, 96 (1986) ("Claim II"); (3)

26   the erroneous jury instruction on attempted manslaughter, which included discussion of implied

1

malice when the crime of attempt requires proving a specific intent to kill, allowed the jury to find Petitioner guilty without the prosecution proving each element of the offense beyond a reasonable doubt ("Claim III"); (4) the trial court erred in imposing the upper term sentence without relying on additional facts proven to the jury ("Claim IV"); and, (5) the trial court erred when it ruled on Petitioner's presentence time credits outside of Petitioner's presence and off the record ("Claim V").  For the reasons stated herein, the federal habeas petition should be denied.

## I.  FACTUAL BACKGROUND[1]

> Starkisha Green was shot and wounded in the parking lot of the Motel 7 in Vallejo at about 7 p.m. on July 5, 2002. She told a Vallejo police officer, who responded to reports of the shooting, that the man who shot her was an African American named "G". Both Green and Melissa Lujan [also referred to as Lisa], who had driven Green to the motel, later identified the shooter as appellant from photo lineups.

> When Lujan's car entered the parking lot of the Motel 7, they encountered a car exiting the parking lot driven by one Nicole Fonseca, with whom Green had a prior altercation. Appellant was a passenger in Fonseca's car.

> As the cars pulled alongside each other, Green and Fonseca started arguing, and soon an argument developed between Green and appellant, with Green accusing appellant of stealing some jewelry. As Lujan tried to drive away, Fonseca's car blocked Lujan's car from leaving. Appellant and another African-American male then jumped into the back seat of Lujan's vehicle, whereupon Green tried to get out of the car. While Green was attempting to get out of the vehicle, two shots were fired. Appellant continued to shoot at her as she ran away from the cars.

> Green was helicoptered to John Muir Hospital in Walnut Creek, where doctors found two bullets in her, one in her stomach and one in her arm. A .22 caliber bullet was removed from Green's stomach.

> The following day, July 6, 2002, another Vallejo police officer stopped appellant for driving without a license plate. A female was in the car with him. Appellant lacked identification. He said his

---

[1]     The factual background is taken from the California Court of Appeal, First Appellate District decision on direct appeal from October 2008 and filed in this Court by Respondent on February 8, 2011 as Lodged Doc. I (hereinafter referred to as the "Slip Op."). Footnotes have been omitted.

name was John Lashawn Harris, but did not know his own age. The officer arrested him and, thereafter, found a loaded .22 caliber revolver under the right-front passenger seat. The gun held nine bullets, but had four bullets and four empty casings inside. In the passenger's purse was another single round.

On September 19, 2002, the Solano County District Attorney filed an information charging appellant with two counts, the first for attempted murder and the second for assault with a deadly weapon. Both counts included allegations of personal use of a firearm and personal infliction of great bodily injury, as well as an allegation of two prior felony convictions after which appellant had not remained free from prison custody for five years. (Pen.Code, §§ 187, subd. (a), 245, subd. (a)(2), 664, 667.5, subd. (b) & (c)(8), 1192.7, subd. (c)(8) & (23), 1203.095, 12022.5, subd. (a)(1), 12022.53, subd. (b), (c) & (d), 12022.7, subd. (a).)

Appellant pled not guilty and denied the various allegations on September 30, 2002.

The case was tried to a jury over three days starting on May 7, 2003. Lujan, who had driven Green to the motel, testified for the prosecution. Green herself could not be located, according to the prosecution; accordingly, her preliminary hearing testimony was read to the jury.

The prosecution also called the motel's manager, three Vallejo police officers involved in the events of July 5 and 6, 2002, and a deputy sheriff/criminalist who testified regarding the similarity between the bullet recovered from Green's stomach and the .22 revolver found in the car appellant was driving. On the last trial day, the prosecution called the court's own bailiff and a Solano County correctional officer who, in combination, testified that, during the trial, appellant had passed a note to another African-American detainee, one Andre Bryant, asking him to "be my alibi witness" for July 5, 2002. This note was read to the jury.

Appellant's trial counsel presented three witnesses, a motel employee named Summerville and two John Muir Medical Center doctors. Summerville testified that, after Green had been shot, she did not identify the shooter by name or other identification. One of the doctors testified that Green told her she used both heroin and methamphetamine, and the other that she had admitted smoking heroin earlier on July 5, 2002.

The prosecution recalled one of the Vallejo police officers who had previously testified as a rebuttal witness. He testified that, when he interviewed Summerville immediately after the shooting, he recalled Green identifying the shooter as "G."

/ / /

3

1

2        After a day and a half of deliberation, the jury returned verdicts
         finding appellant not guilty of attempted murder as charged in
3        count I, but guilty of attempted voluntary manslaughter and also
         guilty of assault with a deadly weapon as charged in count II.
4        Additionally, it found true each of the charged enhancements,
         except that relating to the two charged prior felony convictions (for
5        which appellant was imprisoned at the same time). Appellant
         admitted those.

6        The trial court denied appellant's motion for a new trial on July 2,
7        2003; on July 11, 2003, it sentenced him to a total prison term of
         19 years and six months. This consisted of the upper term of five
8        years, six months, for attempted voluntary manslaughter, an upper
         term of ten years for personal use of a firearm, three years for the
9        infliction of great bodily injury, and one year for the prior prison
         term enhancement. All of these sentences pertained to count I of
10       the information; the court stayed any sentence under count II
         pursuant to [Penal Code] section 654.

11                    II.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

12              An application for writ of habeas corpus by a person in custody under judgment of a state

13       court can only be granted for violations of the Constitution or laws of the United States.  *See* 28

14       U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

15       *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

16       Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

17       and Effective Death Penalty Act of 1996 ("AEDPA") applies.  *See Lindh v. Murphy*, 521 U.S.

18       320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

19       decided on the merits in the state court proceedings unless the state court's adjudication of the

20       claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

21       clearly established federal law, as determined by the Supreme Court of the United States; or (2)

22       resulted in a decision that was based on an unreasonable determination of the facts in light of the

23       evidence presented in state court.  *See* 28 U.S.C. § 2254(d); *Perry v. Johnson*, 532 U.S. 782, 792-

24       93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).  Under section 2254(d)(1), a state

25       court's determination that a claim lacks merit precludes federal habeas relief so long as

26       "fairminded jurists could disagree" on the correctness of the state court's decision.  *Yarborough*

                                                          4

1    *v. Alvarado*, 541 U.S. 652, 664 (2004).  "[A] habeas court must determine what arguments or

2    theories supported or . . . could have supported, the state court's decision; and then it must ask

3    whether it is possible fairminded jurists could disagree that those arguments or theories are

4    inconsistent with the holding in a prior decision of" the Supreme Court.  *Harrington v. Richter*,

5    562 U.S. __, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011).

6    In applying AEDPA's standards, the federal court must "identify the state court decision

7    that is appropriate for our review."  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

8    "The relevant state court determination for purposes of AEDPA review is the last reasoned state

9    court decision."  *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted).

10   "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

11   orders upholding that judgment or rejecting same claim rest upon the same ground."  *Ylst v.*

12   *Nunnemaker*, 501 U.S. 797, 803 (1991).  To the extent no such reasoned opinion exists, courts

13   must conduct an independent review of the record to determine whether the state court clearly

14   erred in its application of controlling federal law, and whether the state court's decision was

15   objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  "The

16   question under AEDPA is not whether a federal court believes the state court's determination

17   was incorrect but whether that determination was unreasonable—a substantially higher

18   threshold."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

19   "When it is clear, however, that the state court has not decided an issue, we review that question

20   *de novo*."  *Reynoso v.Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*,

21   545 U.S. 374, 377 (2005).

22                      III.  ANALYSIS OF PETITIONER'S CLAIMS

23        1.  Claim I

24        In Claim I, Petitioner argues that the prosecution's use of the victim's preliminary hearing

25   testimony at trial violated his constitutional right to confront the witnesses against him

26   guaranteed by the Sixth Amendment.  Petitioner does not argue that the use of preliminary

5

1   hearing testimony violates the Confrontation Clause *per se*.  Rather, Petitioner contends that

2   under the facts of his case, the testimony was inadmissable because Petitioner was not given an

3   adequate opportunity to cross-examine the victim during the preliminary hearing.  This argument

4   stems from three rulings the trial court made during the victim's testimony at the preliminary

5   hearing, upholding the prosecutor's objections and limiting the scope of the cross-examination.

6   Petitioner does not challenge the determination that the witness, whose whereabouts were

7   unknown, was unavailable to testify at his trial.

8          In ruling on Petitioner's Confrontation Clause claim, the California Court of Appeal

9   found as follows:

10         Before trial, the prosecution moved for permission to read Green's
           testimony at the preliminary hearing to the jury. This motion
11         (which was opposed by appellant) was accompanied by many
           pages of exhibits from the files of the district attorney's
12         investigator showing extensive but unsuccessful efforts to
           subpoena Green in both Vallejo and Sacramento. That investigator
13         testified at a pretrial hearing as to these efforts. The trial court
           found there was due diligence in attempting to serve Green, a
14         finding which appellant does not challenge here. Rather, appellant
           argues he did not have an adequate opportunity to cross-examine
15         Green at the preliminary hearing.

16         That hearing took place on September 9, 2002; appellant was
           represented by the same counsel that defended him at trial. Green
17         testified for the prosecution as to the events of July 5, 2002, at the
           Vallejo Motel 7. That direct examination is recorded in
18         approximately 10 pages of the transcript of that hearing.
           Appellant's counsel's cross-examination of Green covers 12 pages
19         of the same transcript. He got her to admit that she was in
           possession of heroin on the day in question and that she knew
20         appellant only as "G."

21         During the course of this cross-examination, the prosecutor made
           seven objections to questions posed to Green by appellant's
22         counsel; four of them were sustained and the other three overruled.
           One of the objections sustained was that the question posed was
23         compound-which it clearly was. The other three were sustained on
           the basis that they sought discovery of issues not directly relevant
24         to the crimes charged and, in one instance, also asked for hearsay.

25         On appeal, appellant claims his counsel was denied an opportunity
           to adequately cross-examine Green at the preliminary hearing.
26         More specifically, he contends that the magistrate's "rulings

                                            6

restricting cross-examination at the preliminary hearing denied appellant an adequate opportunity to cross-examine this shaky witness."

The governing statute on this issue provides: "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid.Code, § 1291, subd. (a)(2).)

Our Supreme Court's most recent interpretation of this statute was in *People v. Zapien* (1993) 4 Cal.4th 929, 974-976. There, a convicted defendant contended he had been denied his right to confront an important witness because, based on her assertion of her privilege against self-incrimination, she had been declared unavailable and her preliminary hearing testimony read to the jury. The defendant argued on appeal that his motive for cross-examining that witness at the preliminary hearing "differed materially and substantially" from his motive for doing so at trial, and thus admission of her preliminary hearing testimony was error.

The court, in an opinion authored by then Associate Justice George, disagreed, holding: "Frequently, a defendant's motive for cross-examining a witness during a preliminary hearing will differ from his or her motive for cross-examining that witness at trial. For the preliminary hearing testimony of an unavailable witness to be admissible at trial under Evidence Code section 1291, these motives need not be identical, only 'similar.' [Citation.] Admission of the former testimony of an unavailable witness is permitted under Evidence Code section 1291 and does not offend the confrontation clauses of the federal or state Constitutions-not because the opportunity to cross-examine the witness at the preliminary hearing is considered an exact substitute for the right of cross-examination at trial [citation], but because the interests of justice are deemed served by a balancing of the defendant's right to effective cross-examination against the public's interest in effective prosecution. [Citations.] [¶] Defendant's interest and motive for cross-examining Inez Blanco during the preliminary hearing were sufficiently similar to those existing at trial so as to permit the admission of Blanco's preliminary hearing testimony. On both occasions, Blanco's testimony relating her contacts with defendant the day preceding the murder, defendant's need for money, and the disappearance of Blanco's automobile near the time of the murder, had the same tendency to establish defendant's guilt. Defendant's interest and motive in discrediting this testimony was identical at both proceedings. Defense counsel's testimony that he chose, for strategic considerations, not to vigorously cross-examine Blanco does not render her former testimony

inadmissible. As long as defendant was given the opportunity for effective cross-examination, the statutory requirements were satisfied; the admissibility of this evidence did not depend on whether defendant availed himself fully of that opportunity. [Citations.]" (*People v. Zapien*, *supra*, 4 Cal.4th at p. 975; *see also*, *People v. Smith* (2003) 30 Cal.4th 581, 611-612; *People v. Samayoa* (1997) 15 Cal.4th 795, 849-852; *People v. Jones* (1998) 66 Cal.App.4th 760, 766-769; *People v. Lepe* (1997) 57 Cal.App.4th 977, 982-985 (*Lepe*), disapproved on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3.)

As noted above, three substantive objections by the prosecution to defense counsel's preliminary hearing cross-examination of Green were sustained. They were to these questions: (1) "Do you know if Nicole [Fonseca] had any of her stuff located in room 135?" FN3; (2) "Do you know Andre Bryant?"; and (3) "Was that relationship [with Fonseca] based on the drug transactions?"

> FN3. Green had testified earlier that she went to the Motel 7 to visit her aunt, who was in room 135.

Appellant argues that precluding defense counsel from getting answers to these questions prevented him from attacking Green's credibility as to, e.g., why she was at the motel at all, her denials that she was there looking for drugs, and her assertion that she did not know why appellant shot her. We disagree. First of all, the trial court was clearly correct in ruling that inquiries during the course of a preliminary hearing which are apparently motivated by a desire for discovery regarding tangential issues are inappropriate. This does not, however, preclude the use of preliminary hearing testimony at trial provided all of the other requirements of Evidence Code section 1291, subdivision (a)(2) are met. (*See, e.g.*, *Lepe*, *supra*, 57 Cal.App.4th at pp. 982-985.)

Two of the questions to which objections were sustained (nos.(1) and (3) above) related to whether Green's relationship with Fonseca was connected with drugs.FN4 Appellant contends he should have been permitted to pursue this point to undermine Green's credibility. We are unpersuaded. The jury in this case was well-acquainted with the fact that Green was a regular drug user. She admitted during cross-examination in the preliminary hearing that, contrary to her answer to a question from the prosecutor a few minutes earlier, she was indeed in possession of some "tar heroin" on the day in question. In the actual trial, Lujan, the driver of the car in which Green was riding, admitted on her direct examination that Green had told Lujan she was "looking for . . . drugs" on the day in question. On cross-examination, Lujan admitted seeing Green use both heroin and "meth" that day. Additionally, two John Muir Medical Center doctors were, as noted above, called as defense witnesses. One testified that, after her admission there, Green admitted using both heroin and methamphetamine; the other

8

1    testified that Green admitted using heroin.

2           FN4. The third question to which an objection was
            sustained ("Do you know Andre Bryant?") was
3           clearly lacking in relevance, absent some offer of
            proof by defense counsel-or even a slight verbal hint
4           to the court-as to who Bryant was, his possible
            connection with the events of July 5, or some other
5           reason as to why Green's knowledge of him was at
            all relevant to the issue of who shot her.

6
     Further, defense counsel's closing argument to the jury
7    concentrated heavily on Green's credibility. He cited
     inconsistencies in her preliminary hearing testimony, her absence
8    from the trial, and the possible impact on her powers of
     observation and recollection of her apparent regular drug use.

9
     As a result of all this, the jury could not have been under any
10   illusions concerning Green's involvement with drugs or even the
     possibility that her desire to visit Motel 7 and/or her altercation
11   with Nicole Fonseca may have had something to do with that
     subject. Thus, the fact that defense counsel was not permitted to
12   pursue these topics at the preliminary hearing was not prejudicial.
     And, in any event, the issue before the jury was not Green's drug
13   use or why she was at Motel 7 on July 5 but, rather, whether
     appellant shot and wounded her then and there. Defense counsel
14   was not foreclosed from cross-examining Green on any aspect of
     that issue at the preliminary hearing.

15

16   Slip Op. at 5-9.

17          Petitioner's claim must fail because the California Court of Appeal's decision is a

18   reasonable interpretation of federal law as determined by the Supreme Court of the United States.

19   The Supreme Court has had several opportunities to address the use of prior testimony by an

20   unavailable witness.  In each of the Supreme Court's cases addressing this issue, the Court has

21   held that the previous testimony of an unavailable declarant is admissible so long as the

22   defendant previously had a complete and adequate opportunity to cross-examine the witness.  *See*

23   *Crawford v. Washington*, 541 U.S. 36, 54, 57 (2004) ("[T]he common law in 1791 conditioned

24   admissibility of an absent witness's examination on unavailability and a prior opportunity to

25   cross-examine.  The Sixth Amendment therefore incorporates those limitations."); *Mancusi v.*

26   *Stubbs*, 408 U.S. 204, 213-16 (1972); *California v. Green*, 399 U.S. 149, 165-68 (1970); *Pointer*

9

1   *v. Texas*, 380 U.S. 400, 406-08 (1965); *Mattox v. United States*, 156 U.S. 237, 243 (1895); *cf.*

2   *Kirby v. United States*, 174 U.S. 47, 55-61 (1899).  While it is true that several cases call into

3   question the difference between the opportunity to cross-examine a witness at a preliminary

4   hearing as compared to an actual trial, *Barber v. Page*, 390 U.S. 719, 725-26 (1968) (noting that

5   a preliminary hearing is ordinarily a less searching exploration into the merits of a case than a

6   trial but recognizing that "there may be some justification for holding that the opportunity for

7   cross-examination of a witness as a preliminary hearing satisfies the demand of the confrontation

8   clause"); *Green*, 399 U.S. at 195-200 (Brennan, J., dissenting) ("[T]he purpose of the

9   Confrontation Clause cannot be satisfied by a face-to-face encounter at the preliminary hearing.

10  Cross-examination at the hearing pales beside that which takes place at trial."),  the Court has

11  never held a statement inadmissable when the defendant had the opportunity to cross-examine

12  the witness at a preliminary hearing and the witness was unavailable at trial.  In *Ohio v. Roberts*,

13  448 U.S. 56 (1980), *overruled on other grounds by Crawford*, *supra*, the Supreme Court held

14  that the preliminary hearing testimony of an unavailable witness was admissible because the

15  defendant's counsel "was not 'significantly limited in any way in the scope or nature of his cross-

16  examination.'" *Id.* at 71 (quoting *Green*, 399 U.S. at 166).

17          In the present case, there is no question that Petitioner's counsel was afforded the

18  opportunity to cross-examine the victim at the preliminary hearing.  *See* Lodged Doc. C

19  (Transcript of Preliminary Hearing) [hereinafter "Prelim. Hr'g Tr."].  Like in *Green* and *Roberts*,

20  the victim's statement at the preliminary hearing was given under circumstances closely

21  approximating those that surround the typical trial.  *Green*, 399 U.S. at 165; *Roberts*, 448 U.S. at

22  69.  The victim was under oath, Petitioner was represented by counsel (the same counsel that

23  later represented Petitioner at trial), and the proceedings were conducted before a judicial

24  tribunal, equipped to provide a judicial record of the hearing.  *Id.*  Petitioner nonetheless argues

25  that the pretrial testimony is inadmissable because the cross-examination was significantly

26  limited.  It is true that the trial court limited the scope of cross-examination, applying California

10

law limiting the scope of the preliminary hearing.[2]  However, the Supreme Court has given little

definition as to what significantly limited cross-examination amounts to.  The Court has not laid

out definable boundaries to help lower courts determine when cross-examination has been so

significantly limited that the testimony could not be used at a later proceeding.  This court, under

AEDPA, can only grant the writ if the state court unreasonably applied Supreme Court precedent.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as

'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington*

*v. Richter*, 562 U.S. __, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) (quoting *Yarborough v.*

*Alvarado*, 541 U. S. 652, 664 (2004)).  Reasonable jurists could conclude that Petitioner's

counsel was provided with ample opportunity to cross-examine the victim at the preliminary

hearing.  As such, Petitioner is not entitled to relief on this claim.

        2.  Claim II

        In Claim II, Petitioner alleges that his constitutional rights were violated when the

prosecution used a peremptory challenge to remove an African-American from the jury based on

race.  Respondent asserts, in accordance with the California Court of Appeal, that the claim is

procedurally barred, arguing that Petitioner never made a proper motion or objection in the trial

court during voir dire.

        Petitioner's claim is procedurally barred.  Though Petitioner's counsel was heard on the

record in regard to his belief that the prosecution had impermissibly used a peremptory challenge

based on race, counsel never actually asked the court to determine the issue.  The California

Court of Appeal held that the issue was "not properly before us for appellate review":

/ / /

---

[2]        In 1990, the California voters passed Proposition 115, the Crime Victims Justice
Reform Act.  Among the act's provisions was an addition to California Penal Code section 866:
"It is the purpose of a preliminary examination to establish whether there exists probable cause to
believe that the defendant has committed a felony. The examination shall not be used for
purposes of discovery."  Cal. Penal Code § 866(b); *see also* 1 Witkin Cal. Evid. 4th Introduction
§ 24 (Effect of Proposition 115).

During voir dire, the prosecutor peremptorily challenged an African-American juror, Patricia G. She was one of 12 jurors excused at the behest of the prosecution; 16 were challenged by the defense.

After the challenge to Patricia G., defense counsel asked to approach the bench where an unreported conversation occurred. A few minutes later, after the jury panel had been excused, the following reported exchange took place:

"THE COURT: ... Mr. Spieckerman [defense counsel], you had an issue you would like to put on the record?

"MR. SPIECKERMAN: Yes, your Honor. Just very briefly. When Ms. Moore [prosecutor] dismissed Patricia G[.] after having passed a few times, and Ms. G [.] is an African-American, she has a close personal friend in the Department of Corrections, answered all of the questions that are asked on the questionnaire as well as the questions that Counsel may have posed to her in a fashion that certainly showed she would be a fair and impartial juror, and then was disqualified or dismissed by Ms. Moore, I realized, as I indicated to the Court under Wheeler, I need to show a series of that sort of conduct. But it is also incumbent upon me to state when I think there is a problem. Any of the other witnesses or jurors that may have been African-Americans, I would understand any kind of a reason she had for those because hearing their answers. But this particular person I think would have been a very good juror, and I wanted to just make the record to get it started.

"THE COURT: And that is all you are asking of the court at this time?

"MR. SPIECKERMAN: Yes, your Honor.

"THE COURT: You have made your record."

Appellant now contends the trial court committed prejudicial error by failing to find a prima facie case of error under *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), *overruled in part by Johnson v. California* (2005) 545 U.S. 162, and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) or, alternatively, to make further inquiry into that issue. We disagree; we agree, rather, with the People that there was both no proper objection on *Wheeler/Batson* grounds FN5 and no trial court error in any event. A simple reading of the excerpt from the voir dire transcript quoted above makes clear that there simply was no *Wheeler* motion made, much less a proper one. Our Supreme Court has been consistent in putting the burden on the defendant in the trial court to raise the issue of discriminatory exclusion of prospective jurors in the proper way. In *Wheeler* itself, the court wrote: "If a party believes his opponent is using his peremptory challenges to strike jurors on

the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, as in the case at bar, he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (*Wheeler*, *supra*, 22 Cal.3d at p. 280, fn. omitted.)

> FN5. Preliminarily, the People take the position that we should not even consider whether there was any objection raised on *Batson* grounds, because defense counsel did not mention that case. We do not need to reach this issue, because of our holding (see the following paragraphs) that no *Wheeler* motion was properly made. But, if we found it had been, we would not agree with the People. We read our Supreme Court's latest statements on this subject as effectively saying that once a Wheeler motion is made, a *Batson* motion is also. (*See People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.)

What transpired here does not comply with these Wheeler mandates. Rather, this record is similar to what the same court was faced with in *People v. Gallego* (1990) 52 Cal.3d 115 (*Gallego*), where it unanimously affirmed murder and kidnapping convictions of the defendant. One of the issues he raised on appeal was *Wheeler*, asserting that "the trial court committed prejudicial error by failing to make inquiry into his claim that the prosecutor was using his peremptory challenges to remove Blacks from the jury." (*Id.* at p. 166.) There, the defendant, who was representing himself, brought a motion claiming that there had been an under-representation of both African-Americans and ex-convicts on the jury panels sent to the trial department. (*See People v. Buford* (1982) 132 Cal.App.3d 288.) At the conclusion of the hearing on that motion, he noted "that the prosecution had disqualified all Blacks who 'did hit the jury box.'" (*Gallego*, *supra*, 52 Cal.3d at p. 166.) On appeal, he claimed that the trial court's failure to " 'inquire into his comment requires reversal under *Wheeler* . . . .'" (*Id.* at p. 166.) The court disagreed, stating: "Defendant failed even to raise a Wheeler claim, let alone establish a prima facie case of misuse of peremptory challenges." (*Ibid.*) FN6

> FN6. Similarly, in *People v. Montiel* (1993) 5 Cal.4th 877, 909, the court held: "A party who suspects improper use of peremptory challenges must raise a timely objection and make a prima

13

facie showing of strong likelihood that the opponent has excluded one or more jurors on the basis of group or racial identity." (*See also*, *People v. Fuentes* (1991) 54 Cal.3d 707, 714.)

Even if there was no clear-cut *Wheeler* motion, appellant argues that, at the minimum, his counsel's "for the record" statement "was more than sufficient to trigger the court's duty to inquire into the sufficiency of the prima facie showing." Again, we disagree. As the Supreme Court held in *People v. Bolin* (1998) 18 Cal.4th 297, 316-317 (*Bolin*), such a proposition "conflicts with the procedure set forth in *Wheeler* allocating to the aggrieved party the burden of raising the point in a timely fashion and making a prima facie case of impermissible discrimination. [Citation.] Whatever the obligations of the trial court to control the jury selection process, the defendant must comply with procedural prerequisites to preserve any error for appeal. [Citation.] Absent an appropriate challenge to the prosecutor's exercise of peremptories, the issue is not preserved. [Citation.]"

Further, even if we could construe defense counsel's "for the record" comment during voir dire as an appropriate *Wheeler* motion, there is no possible way that, based on the record before us, we could review that issue. For example, we know that the prosecution peremptorily challenged 11 other jurors besides Patricia G., but we do not know how many of them, if any, were African-American. Similarly, we do not know the racial mix of the 16 prospective jurors challenged by appellant. Finally, we do not know how many, if any, African-Americans were ultimately seated as jurors or anything else about the racial make-up of the jury.

Simply put, a *Wheeler*/*Batson* issue is not properly before us for appellate review.

Nor is appellant's "fall-back" argument that defense counsel rendered ineffective assistance by not making a *Wheeler* motion persuasive. As our Supreme Court has ruled several times in similar situations, "the record affords no basis for concluding that counsel's omission was not based on an informed tactical choice." (*People v. Anderson* (2001) 25 Cal.4th 543, 569-570; *see also Bolin*, *supra*, 18 Cal.4th at p. 317.) The "tactical choice" possibility is especially pertinent here because the juror in question had an aunt employed by the U.S. Customs Service and a "best friend" who worked for the California Department of Corrections and whom she saw "[t]wo or three times a week."

Finally on this subject, and because the record before us contains no evidence regarding either the use of other peremptory challenges or the ultimate make-up of the jury, it is highly unlikely that any prima facie case of racial discrimination could have been, much less could now be, established. As a result, no prejudice from

1  |  any conceivable ineffective assistance of counsel could be
2  |  established. (*See, e.g.*, *People v. Farnam* (2002) 28 Cal.4th 107,
   |  136-138; *People v. Turner* (1994) 8 Cal.4th 137, 167-168,
3  |  *overruled on other grounds in People v. Griffin* (2004) 33 Cal.4th
   |  536, 555, fn. 5.)

4  Slip Op. at 9-12.

5       California's contemporaneous objection rule is well established, clearly defined, and

6  consistently applied.  *See, e.g.*, *Bundy v. Sierra Lumber Co.*, 149 Cal. 772, 87 P. 622 (1906);

7  *People v. Morris*, 53 Cal. 3d 152, 195-96, 807 P.2d 949 (1991), *overruled in part on other*

8  *grounds by People v. Stansbury*, 9 Cal. 4th 824, 830 n. 1, 889 P.2d 588 (1995) ("defendant failed

9  to advance in the trial court the specific ground for exclusion he now urges"); *People v.*

10 *Coleman*, 46 Cal. 3d 749, 776-77, 759 P.2d 1260 (1988).  In California, it is "the general rule

11 that questions relating to the admissibility of evidence will not be reviewed on appeal in the

12 absence of a specific and timely objection in the trial court on the ground sought to be urged on

13 appeal."  *People v. Rodgers*, 21 Cal. 3d 541, 547-48, 579 P.2d 1048 (1978) (citing *People v.*

14 *Welch*, 8 Cal. 3d 106, 114-15, 501 P.2d 225 (1972); *People v. De Santiago*, 71 Cal. 2d 18, 22,

15 453 P.2d 353 (1969)) (other citations omitted).

16      Moreover, the California Supreme Court has outlined the procedure that is required to

17 properly make a claim of discriminatory exclusion of prospective jurors.  *People v. Wheeler*, 22

18 Cal. 3d 258, 280, 583 P.2d 748 (1978).  Under California law, which mirrors the procedure

19 required by the federal charter, the burden is on the defendant to first make a prima facie showing

20 that a challenge was made on an impermissible basis, such as race.  *Id.*; *see People v. Monteil*, 5

21 Cal. 4th 877, 909, 855 P.2d 1277(1993) ("A party who suspects improper use of peremptory

22 challenges must raise a timely objection and make a prima facie showing of strong likelihood

23 that the opponent has excluded one or more jurors on the basis of group or racial identity."); *see*

24 *also Batson v. Kentucky*, 476 U.S. 79, 96 (1986); *Johnson v. California*, 545 U.S. 162, 170-71

25 (2005).  To establish a prima facie case, a petitioner must show that (1) the prospective juror is a

26 member of a cognizable racial group, (2) the prosecutor used a peremptory strike to remove the

juror, and (3) the totality of the circumstances raises an inference that the strike was motivated by race. *See Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir. 2006) (citing *Batson*, 476 U.S. at 96).[3] As the Court of Appeal noted, California law placed the burden on Petitioner in the trial court to raise the issue of discriminatory exclusion and "what happened here does not comply with these . . . mandates."  Slip Op. at 10; *Wheeler*, 22 Cal. 3d at 280.

During jury voir dire, after the prosecution used a peremptory challenge to remove a female African-American juror, Petitioner's counsel placed on the record his belief that she would have made an excellent juror and that he believed she may have been removed as a result of her race.  Lodged Doc. E (Rep.'s Tr. of Voir Dire), at 170.  Petitioner's counsel was only "put[ting] the issue on the record."  *Id.* (trial judge's language).  After counsel's statement, the court verified that counsel was not making an objection or motion at that time.  *Id.*  As such, Petitioner never actually raised the issue of discrimination for the trial court to rule on.  Failure to do so under the procedures set forth in California law and contemporaneously in the trial court precludes this court from reaching the merits of Petitioner's claim.

As with his claim before the California Court of Appeal, here Petitioner attempts to avoid the procedural default by arguing that his counsel did not provide effective assistance when he failed to properly object to the prosecution's use of a peremptory strike to remove an African-American from the jury, in violation of the Sixth Amendment.

The Sixth Amendment guarantees effective assistance of counsel.  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating

---

[3]  If the defendant can make such a prima facie showing, the burden shifts to the State to show a neutral explanation for the peremptory challenge.  *Batson*, 476 U.S. at 97-98.  Where the State offers a race-neutral explanation for the challenge, the trial court decides whether the defendant has proved the prosecutor's motive for the challenge was purposeful racial discrimination.  *See Boyd*, 467 F.3d at 1139; *see also Batson*, 476 U.S. at 98.  The opponent of the strike has the ultimate burden of persuasion regarding racial motivation.  *See Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam).  Because the California Court of Appeal made a reasonable determination that Petitioner failed to make a prima facie showing that the peremptory strikes in question were racially motivated, it is unnecessary to move to the second and third steps of the *Batson* analysis.

1  ineffective assistance of counsel.  First, the petitioner must show that considering all the

2  circumstances, counsel's performance fell below an objective standard of reasonableness.  *See id.*

3  at 688.  Petitioner must identify the acts or omissions that are alleged not to have been the result

4  of reasonable professional judgment.  *See id.* at 690.  The federal court must then determine

5  whether in light of all the circumstances, the identified acts or omissions were outside the range

6  of professional competent assistance.  *See id.*

7      Second, a petitioner must affirmatively prove prejudice.  *See id.* at 693.  Prejudice is

8  found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

9  result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is "a

10 probability sufficient to undermine the confidence in the outcome."  *Id.*  A reviewing court "need

11 not determine whether counsel's performance was deficient before examining the prejudice

12 suffered by defendant as a result of the alleged deficiencies . . . [i]f it is easier to dispose of an

13 ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

14 followed."  *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (citing *Strickland*, 466 U.S. at

15 697).  When analyzing a claim for ineffective assistance of counsel where a state court has issued

16 a decision on the merits, a habeas court's ability to grant the writ is limited by two "highly

17 deferential" standards.  *Premo v. Moore*, __ U.S. __, 131 S.Ct. 733, 740, 178 L.Ed.2d 649

18 (2011).  "When § 2254(d) applies," as it does here, "the question is not whether counsel's actions

19 were reasonable.  The question is whether there is any reasonable argument that counsel satisfied

20 *Strickland*'s deferential standard."  *Id.*

21     The California Court of Appeal reached a reasonable determination when it concluded

22 that Petitioner could not establish that his counsel's performance fell below an objective standard

23 of reasonableness.  It is reasonable to conclude that Petitioner's counsel did not follow up with

24 his on-the-record statement regarding discrimination because he did not believe that he could

25 make a prima facie showing that the totality of the circumstances raised an inference that the

26 strike was motivated by race.  *Batson*, 476 U.S. at 96.  When placing his statement in the record,

17

1  Petitioner's counsel said that he "need[ed] to show a series of [discriminatory] conduct," but that
2  it was incumbent upon him to start when he thought there was a problem.  Lodged Doc. E, at
3  170.  While it is difficult to determine strictly from reviewing the record, a review of the voir dire
4  transcript indicates that there were no additional strikes used by the prosecution that led
5  Petitioner's counsel to believe that race was a motivating factor.  The available evidence
6  indicates that Petitioner's counsel, while believing a possible issue existed, did not think that he
7  could establish a prima facie case of discrimination and, therefore, chose not to pursue the claim.
8  Applying the highly deferential standard for which ineffective assistance of counsel claims are
9  reviewed under AEDPA, a reasonable argument can be made that counsel satisfied *Strickland*'s
10  already deferential standard.  *Moore*, 131 S.Ct. at 740.  Petitioner is not entitled to relief on this
11  claim.

12       3.  Claim III

13       In Claim III, Petitioner alleges that his trial was rendered fundamentally unfair when the
14  trial court gave an incorrect instruction in regard to attempted voluntary manslaughter.  Both
15  parties and the California Court of Appeal agree that the instruction was erroneous.  In fashioning
16  a jury instruction for attempted manslaughter, the trial court modified the model manslaughter
17  instruction, CALJIC No. 8.40.  The modified language still included implied malice, allowing the
18  jury to find Petitioner guilty of attempted manslaughter if he showed a "conscious disregard for
19  human life."  However, because Petitioner was charged with attempt, which requires a showing
20  of a specific intent to kill, the instruction was erroneous.  Respondent maintains that the error
21  does not rise to the level of a constitutional error or, in the alternative, that any error was
22  harmless.

23       The California Court of Appeal ruled as follows:

24            Although the charge against appellant in count I of the information
            was attempted murder, the prosecution provided the court with
25            proposed instructions on the lesser included offense of attempted
            voluntary manslaughter. Defense counsel stated that he "had no
26            problem with that." But then, a minute or so later, he noted that

18

most of the relevant voluntary manslaughter instructions used the words "killing of a human being," and that such was inappropriate when what was possibly at issue was attempted manslaughter. After much dialogue back and forth between the court and counsel, all agreed that the court could and would add to the pertinent proposed instructions (CALJIC Nos. 8.40, 8.42, 8.43, and 8 .50) the words "attempts," "attempts to," or "attempted."

The ultimate problem with all of this was that, in the modified version of CALJIC No. 8.40 given to the jury,FN7 the "conscious disregard for human life" language was retained. Clearly, neither the court nor counsel recognized that, whereas this language would have been pertinent and proper in a pure voluntary manslaughter instruction, it was not appropriate in one pertaining to attempted voluntary manslaughter.FN8

> FN7. The modified version of CALJIC No. 8.40 given to the jury read (italics showing addition): "Every person who unlawfully attempts to kill another human being without malice aforethought but either with an intent to kill, or with conscious disregard for human life, is guilty of attempted voluntary manslaughter in violation of Penal Code section 192, subdivision (a). [¶] There is no malice aforethought if the attempt to kill occurred upon a sudden quarrel or heat of passion. [¶] 'Conscious disregard for life,' as used in this instruction, means that an attempted killing results from the doing of an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his or her conduct endangers the life of another and who acts with conscious disregard for life. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. An attempt was made to kill a human being; [¶] 2. The attempted killing was unlawful; and [¶] 3. The perpetrator of the attempted killing either intended to kill the alleged victim, or acted in conscious disregard for life; and [¶] 4. The perpetrator's conduct resulted in the attempted unlawful killing.

> FN8. A specific intent to kill is required for a conviction for attempted voluntary manslaughter; a "conscious disregard for life" is insufficient. (See, e.g., People v. Gutierrez (2003) 112 Cal.App.4th 704, 710; People v. Montes (2003) 112 Cal.App.4th 1543, 1546-1552 (Montes ).)

/ / /

19

The People argue that any error here was both invited and harmless. We disagree with the former argument but agree with the latter.

It is clear that defense counsel wanted the words "attempt," "attempt to," or "attempted" added throughout the voluntary manslaughter instructions originally proposed by the prosecutor. That, and only that, was the point of his insistence on changes being made to the original CALJIC instructions. He never addressed the issue of whether the modified version of CALJIC No. 8.40 which was going to be read to the jury should or should not retain the "conscious disregard for human life" words used in the first and third sentences of the instruction. The only reference to those words was by the court, which indicated an intent to retain them but add the word "attempted" to the third sentence. Defense counsel was never asked if he agreed with that intention, nor did he either volunteer or imply such agreement. In those circumstances, we cannot and do not find invited error, because "merely acceding to an erroneous instruction does not constitute invited error." (*People v. Smith* (1992) 9 Cal.App.4th 196, 207, fn. 20; *cf. also People v. Wickersham* (1982) 32 Cal.3d 307, 333-335, *overruled on other grounds in People v. Barton* (1995) 12 Cal.4th 186, 201; *People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1264.)

The situation is different, however, regarding whether the modified version of CALJIC No. 8.40 with which the jury was instructed was prejudicial to appellant. First of all, our standard of review of errors in instructions concerning lesser-included offenses is whether it is reasonably probable that the erroneous instruction affected the outcome. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Our Supreme Court so held in *People v. Breverman* (1998) 19 Cal.4th 142, 164-179 (*Breverman*), overruling *People v. Sedeno* (1974) 10 Cal.3d 703. It reaffirmed that point even more recently in the highly-pertinent *People v. Lasko* (2000) 23 Cal.4th 101, 111-113 (*Lasko*).FN9 (*Cf. also People v. Montes*, *supra*, 112 Cal.App.4th at p. 1552.)

> FN9. *Lasko* makes clear that, since *Breverman*, the state, and not the federal (*see Chapman v. California* (1967) 386 U.S. 18) standard applies in circumstances such as those present here, i.e., misinstruction regarding a lesser included offense. Although appellant's counsel cites *Lasko* once in his opening brief, he does not in his reply brief, notwithstanding the People's substantial (and in our opinion correct) reliance on *Lasko* regarding the relevant standard of review in the instant circumstances. Appellant belatedly argued, in a petition for rehearing after our first opinion in this case, that, despite *Lasko* and *Breverman*, the federal *Chapman* standard of prejudice applied here

because, unlike those cases, appellant was convicted
of the lesser-included offense. Even if this argument
is correct, for the reasons we outline in the
remainder of this section, any error was not
prejudicial even under a *Chapman* standard of
review.

Under the *Watson* test, it is simply not "reasonably probable" that
the erroneous retention of the "conscious disregard" language in
the modified version of CALJIC No. 8.40 affected the outcome
here. In the first place, in closing argument the prosecution
discussed the attempted voluntary manslaughter possible alternate
verdict in all of two sentences. More importantly, it did so by
urging its rejection by the jury and, rather, their conviction of
appellant of the charged offense, attempted murder. The defense
never addressed the issue at all, its position being that the
prosecution had never established that appellant was the shooter,
principally because of the unreliability of Green's and Lujan's
testimony.

But even more importantly, the evidence that appellant was (1) the
shooter and (2) shot Green with intent to kill was very substantial.
On the first point, and in addition to the testimony of Green and
Lujan, the jury heard from the officer who arrested appellant the
day after the shooting and found in the car he was driving a .22
caliber revolver containing four empty casings. It then heard from a
Vallejo police detective that both Lujan and Green (the latter
twice) had picked out appellant's picture from photo line-ups. It
also heard from a county criminalist that the .22 caliber bullet
removed from Green's stomach was ballistically consistent with
the revolver found in appellant's car. Finally, the jury had read to it
the note that appellant, during the trial, apparently passed to Andre
Bryant asking Bryant to provide an alibi for him. During less than
two days of deliberation, the jury asked only one question of the
court (regarding whether Bryant had been listed as a potential
witness for either side) and for the re-reading of the testimony of
only Green and Lujan.

On the second point, intent to kill, the jury knew that Green had
one .22 caliber bullet removed from her stomach but still had
another in her arm and that, according to her, four shots had been
fired by appellant.FN10

> FN10. Lujan testified that she had definitely heard
> two shots but that it was "possible" there were
> more.

Under these circumstances, we have no difficulty in concluding
that the erroneous inclusion of the two references to "conscious
disregard for human life" in the modified version of CALJIC No.
8.40 with which the jury was instructed was not prejudicial to

21

1        appellant.

2  Slip Op. at 12-16.

3        In a criminal trial, the State must prove every element of the offense, and a jury

4  instruction violates due process if it fails to give effect to that requirement.  *See Sandstrom v.*

5  *Montana*, 442 U.S. 510, 520-521 (1979).  Nonetheless, not every ambiguity, inconsistency, or

6  deficiency in a jury instruction rises to the level of a due process violation.  The question is

7  "'whether the ailing instruction . . . so infected the entire trial that the resulting conviction

8  violates due process.'"  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (*quoting Cupp v. Naughten*,

9  414 U.S. 141, 147 (1973)).  "'[A] single instruction to a jury may not be judged in artificial

10  isolation, but must be viewed in the context of the overall charge.'"  *Boyde v. California*, 494

11  U.S. 370, 378 (1990) (quoting *Cupp*, 414 U.S. at 146-47).  If the charge as a whole is ambiguous,

12  the question is whether there is a "'reasonable likelihood that the jury has applied the challenged

13  instruction in a way' that violates the Constitution."  *Estelle*, 502 U.S. at 72 (quoting *Boyde*, 494

14  U.S.  at 380).  Even if an instruction is constitutionally deficient by allowing the jury to convict

15  on a legally improper theory, the error is not structural and is subject to harmless error analysis.

16  *Hedgpeth v. Pulido*, 555 U.S. 57 (2008) (per curiam).  As such, relief can only be granted if the

17  error "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*

18  *v. Abrahamson*, 507 U.S. 619, 623 (1993) (internal quotation marks omitted); *see also Fry v.*

19  *Pliler*, 551 U.S. 112, 117-20 (2007) (federal habeas court properly applies *Brecht* harmless

20  standard regardless of whether or under what standard state court considered harmless error).

21  The *Brecht* standard requires reversal only if, but for the error, there is "a reasonable probability"

22  that the jury would have reached a different result.  *Clark v. Brown*, 450 F.3d 898, 916 (9th Cir.

23  2006).

24        Assuming, *arguendo*, that the given instruction with regard to attempted manslaughter

25  violated Petitioner's constitutional rights, the error was harmless.  While the "conscious

26  disregard" language remained in the instruction, neither the prosecution nor Petitioner argued

1  such a theory to the jury in closing argument.  Moreover, the evidence that Petitioner did have the

2  intent to kill the victim was strong.  The victim, Starkisha Green, identified the defendant as the

3  person who shot her.  Prelim. Hr'g Tr. at 7.[4]  Green was the passenger in a vehicle driven by Lisa

4  Lujan.  When entering a motel parking lot, Green, who was sitting in the front passenger seat,

5  entered into an argument with the driver of another car, Nicole Fonseca.  Green testified that

6  Petitioner, who was a passenger in the vehicle driven by Fonseca, got out of Fonseca's car and

7  then entered the back seat of Lujan's car where he sat directly behind Green.  *Id.* at 9.  When

8  Green told Lujan not to drive away, Petitioner shot Green in the back.  *Id.*  Green attempted to

9  flee to the motel lobby.  After she had exited the vehicle and was running towards the motel, she

10  saw Petitioner chasing her, in broad daylight, with a gun in his hand.  *Id.* at 12.  Petitioner shot

11  her again, this time in the arm.  *Id.* at 11.

12       Lujan's trial testimony told a similar story.  Rep.'s Tr. at 64.  Lujan testified that Green

13  had asked her to take Green to the motel in order to purchase drugs.  As they entered the motel

14  parking lot, Lujan pulled alongside Fonseca's car and an argument began between Green and

15  Fonseca in which Green accused Fonseca of stealing jewelry.  Later in the argument, Green

16  accused Petitioner of being involved in the alleged jewelry theft, which Petitioner denied.  *Id.* at

17  65-66.  The argument nearly turned into a physical altercation when Lujan intervened and started

18  to drive away.  Before Lujan could drive away, Fonseca used her car to block the exit.  *Id.* at 67.

19  That is when Petitioner and another black male exited Fonseca's vehicle and got in the back seat

20  of Lujan's, with Petitioner sitting behind Green.  Lujan testified that Green attempted to exit the

21  vehicle but before she could Lujan heard two shots from the backseat.  *Id.* at 69.  Lujan saw

22  Green get out of the car and start running, then she put her head on her lap and covered her head.

23  When she looked up again, everyone was gone.  *Id.* at 70.

24  / / /

25

26       [4]    As discussed above, Green's testimony from the preliminary hearing was read to
the jury when it was determined that Green was unavailable as a witness at trial.

23

1   The victim's testimony established that Petitioner shot her with the intent to kill.

2   Petitioner was only sitting, at most, a few feet behind Green when he pulled the trigger, hitting

3   her in her back.  The fact that the shots were fired in such close proximity to the victim shows

4   that he had the intent to kill.  This is further substantiated by the fact that after the victim escaped

5   from the vehicle, Petitioner chased after her and shot her again.  It was only after Green reached a

6   relative place of safety in the motel lobby that Petitioner fled the scene.  The substantial evidence

7   that Petitioner intended to kill the victim, along with the fact that no argument was made to the

8   jury with regard to the conscious disregard element of the instruction, leads to the conclusion that

9   the jury would have reached the same verdict had the proper instruction been given.  As such,

10  there is no reasonable probability that the jury would have reached a different verdict if the error

11  had not occurred, *Clark*, 450 F.3d at 916, and the error did not have a substantial and injurious

12  effect or influence in determining the jury's verdict.  *Brecht*, 507 U.S. at 623.  Petitioner is not

13  entitled to relief on this claim.

14      4.  Claim IV

15      In Claim IV, Petitioner challenges the imposition of the upper term sentence as being

16  imposed in violation of his right to a jury trial on all issues.  Petitioner was sentenced to the

17  upper term on both the attempted manslaughter charge and the sentencing enhancement for

18  personal use of a firearm in the course of the attempted manslaughter.

19      In ruling on this claim, the California Court of Appeal stated as follows:

20      [A]ppellant contends *Blakely* [*v. Washington* (2004) 542 U.S.
        295]error was committed when the trial court sentenced appellant
21      to the upper terms on both count one and the enhancement alleged
        pursuant to section 12022.5, subdivision (a), pertaining to personal
22      use of a firearm during the commission of the attempted voluntary
        manslaughter.
23
        The controlling principle in this area was announced by the United
24      States Supreme Court in *Apprendi v. New Jersey* (2000) 530 U.S.
        466, 490 (*Apprendi*) which states: "Other than the fact of a prior
25      conviction, any fact that increases the penalty for a crime beyond
        the prescribed statutory maximum must be submitted to a jury, and
26      proved beyond a reasonable doubt."

24

In *Blakely*, *supra*, 542 U.S. 296, the Supreme Court held that a Washington State court violated the *Apprendi* rule and denied a criminal defendant his constitutional right to a jury trial by increasing that defendant's sentence for second-degree kidnapping from the "standard range" of 49 to 53 months to 90 months based on the trial court's finding that the defendant acted with "'deliberate cruelty.'" (*Blakely*, *supra*, 542 U.S. at pp. 303-304.) In reaching this conclusion, the court clarified that, for *Apprendi* purposes, the "statutory maximum" is "not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." (*Ibid.*) *Blakely* raised concerns about the constitutionality of California's Determinate Sentencing Law (DSL). Under our DSL, the maximum sentence a judge may impose for a conviction without making any additional findings is the middle term. Penal Code section 1170, subdivision (b), states that "the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime." Furthermore, rule 4.420(b), states that "[s]election of the upper term is justified only if, after a consideration of all the relevant facts, the circumstances in aggravation outweigh the circumstances in mitigation." If, pursuant to *Blakely*, the statutory maximum sentence under California's DSL is the middle term, then an upper term sentence based on aggravating circumstances, other than the fact of a prior conviction, that are found by the trial court rather than by a jury would violate the *Apprendi* rule.

The California Supreme Court attempted to resolve the constitutional issue in *Black I*, *supra*, 35 Cal.4th 1238. The *Black I* court held that "the judicial fact-finding that occurs when a judge exercises discretion to impose an upper term sentence or consecutive terms under California law does not implicate a defendant's Sixth Amendment right to a jury trial." (*Id.* at p. 1244.) The court reasoned that, under California's sentencing system, "the upper term is the 'statutory maximum' and a trial court's imposition of an upper term sentence does not violate a defendant's right to a jury trial under the principles set forth in *Apprendi*, *Blakely*, and [ *United States v.*] *Booker* [(2005) 543 U.S 220]." (*Black I*, *supra*, 35 Cal.4th at p. 1254.)

However, and as noted earlier, the United States Supreme Court recently held that California's DSL does violate the constitutional principle embodied in the *Apprendi* rule. (*Cunningham*, *supra*.) *Cunningham* held that the DSL, "by placing sentence-elevating fact-finding within the judge's province, violates a defendant's right to trial by jury safeguarded by the Sixth and Fourteenth Amendments." (127 S.Ct. at p. 860.) The court reasoned that, under the DSL, the middle term and not the upper term is the relevant statutory maximum because (1) an upper term sentence can be imposed only if the judge finds aggravating circumstances, and (2) aggravating circumstances "depend on facts found

25

discretely and solely by the judge." Furthermore, the court found, "[b]ecause circumstances in aggravation are found by the judge, not the jury, and need only be established by a preponderance of the evidence not beyond a reasonable doubt, . . . the DSL violates *Apprendi*'s bright-line rule: Except for a prior conviction, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'' [Citation.]" (*Id.* at p. 868.) FN12

> FN12. The *Cunningham* court expressly disagreed with the California Supreme Court's decision in *Black I*, *supra*, 35 Cal.4th 1238, stating that "[c]ontrary to the *Black* court's holding, our decisions from *Apprendi* to *Booker* point to the middle term specified in California's statutes, not the upper term, as the relevant statutory maximum. Because the DSL authorizes the judge, not the jury, to find the facts permitting an upper term sentence, the system cannot withstand measurement against our Sixth Amendment precedent." (127 S.Ct. at p. 871.)

Our Supreme Court then issued its decision in *Black II*, *supra*, 41 Cal.4th 799. In *Black II*, the court concluded that "if one aggravating circumstance has been established in accordance with the constitutional requirements set forth in *Blakely*, the defendant is not 'legally entitled' to the middle term sentence, and the upper term sentence is the 'statutory maximum." (*Id.* at p. 813.) The court went on to hold that, pursuant to *Apprendi*, the fact of a prior conviction is an aggravating circumstance that may be found by the court, rather than a jury, and used to impose the upper term without offending defendant's federal constitutional rights. *(Id.* at p. 818.)

In this case, the trial judge here was careful and precise in the way he identified and articulated the various aggravating factors under (former) rule 4.421 of the California Rules of Court. It is clear from the record of the sentencing hearing that appellant's admitted two prior felony convictions (which resulted in one prison term) were not considered by the trial court as an aggravating factor. Indeed, the trial court expressly disclaimed any such reliance during the sentencing hearing. Rather, citing subdivisions (a)(1), (2), (3) & (4) and (b)(1) & (2) of former rule 4.421, the court articulated as aggravating factors which caused it to impose the upper term for both the attempted voluntary manslaughter conviction and the personal use of a firearm enhancement the fact that appellant's crime involved "great violence," "a threat of great bodily harm," were "perpetrated by Mr. Powell [with] a high degree of cruelty, viciousness, as well as callousness," as well as the fact that appellant "did use a weapon at the time" directed at a victim who "was particularly vulnerable." The court also relied on the additional facts that appellant was on parole at the time of the

offenses and had attempted to suborn perjury during the course of the trial.

In *Black II*, the Court held that "defendant's criminal history," "satisf[ies] Sixth Amendment requirements and render[s] him eligible for the upper term. Therefore, he was not legally entitled to the middle term, and his Sixth Amendment right to jury trial was not violated by imposition of the upper term sentence for the offense of continuous sexual abuse of a child." *(Black II*, *supra*, 41 Cal.4th at p. 820.)

Here the trial court identified a single recidivist factor in imposing the aggravated term, namely that defendant was on parole at the time he committed the present offenses. Pursuant to *Black II*, *supra*, 41 Cal.4th at page 818, because the trial court relied on at least one recidivist factor in imposing the upper term, defendant's federal constitutional right to a jury trial under the Sixth Amendment and his right to due process under the Fourteenth Amendment as explicated in *Blakely*, *supra*, 542 U.S. 296 and *Cunningham*, *supra*, 549 U.S.270 [127 S.Ct. 856] were not violated.

Although the sentence in this case was pronounced over a year before *Blakely* was handed down, the ruling in that case clearly applies here because this case was on appeal during that period and hence its result was not final. (*See*, *e.g.*, *Griffith v. Kentucky* (1987) 479 U.S. 314, 328; *People v. Ashmus* (1991) 54 Cal.3d 932, 991.) Thus we categorically reject the People's contention-restated, fortunately briefly in their post-*Blakely* brief-that appellant "forfeited" his right to claim *Blakely* error by not raising that issue below. Because of the constitutional implications of the error at issue, we question whether the forfeiture doctrine applies at all. (*See People v. Vera* (1997) 15 Cal.4th 269, 276-277 [claims asserting deprivation of certain fundamental, constitutional rights not forfeited by failure to object].) Furthermore, there is a general exception to this rule where an objection would have been futile. (*People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 648, and authority discussed therein.) We have no doubt that, at the time of the sentencing hearing in this case, an objection that the jury rather than the trial court must find aggravating facts would have been futile. (*See* Pen.Code, § 1170, subd. (b) & former Cal. Rules of Court, rules 4.409 & 4.420-4.421.) In any event, we have discretion to consider issues that have not been formally preserved for review. (*See* 6 Witkin & Epstein, Cal.Criminal Law (3d ed.2000), Reversible Error, § 36, p. 497.) Since the purpose of the forfeiture doctrine is to "encourage a defendant to bring any errors to the trial court's attention so the court may correct or avoid the errors" (*People v. Marchand* (2002) 98 Cal.App.4th 1056, 1060), we would find it particularly inappropriate to invoke that doctrine here in light of the fact that *Blakely* was decided after appellant was sentenced.

27

1   Slip Op. at 17-21.

2          The Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows

3   a judge to impose a sentence above the statutory maximum based on a fact, other than a prior

4   conviction, not found by a jury or admitted by the defendant.  *Apprendi v. New Jersey*, 530 U.S.

5   466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); *Blakely v. Washington*, 542 U.S. 296 (2004);

6   *United States v. Booker*, 543 U.S. 220 (2005).  In *Cunningham v. California*, 549 U.S. 270

7   (2007), the Supreme Court had the opportunity to apply its previous rulings to California's

8   determinate sentencing law.  Under California's determinate sentencing law, the statute defining

9   most offenses, including Petitioner's, "prescribes three precise terms of imprisonment—a lower,

10  middle, and upper term sentence."  *Cunningham*, 549 U.S. at 277; *see People v. Black*, 35 Cal.

11  4th 1238, 1247, 29 Cal. Rptr. 3d 740, 113 P.3d 534 (2005) ("*Black I*"), *overruled by*

12  *Cunningham* (outlining California's determinate sentencing law).  California Penal Code section

13  1170, subsection (b) governs the trial court's choice; it provides that "the court shall order

14  imposition of the middle term, unless there are circumstances in aggravation or mitigation of the

15  crime."  Therefore, the maximum sentence which a defendant may receive based solely on the

16  facts reflected in the jury verdict is the middle term—the statutory maximum for purposes of the

17  Sixth Amendment.  *Cunningham*, 549 U.S. at 289; *Blakely*, 542 U.S. at 303 ("[T]he 'statutory

18  maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the*

19  *basis of the facts reflected in the jury verdict or admitted by the defendant*."  (emphasis in

20  original)).

21         In California, in order for a trial court to sentence a defendant to the upper term, the court

22  need only find one aggravating factor.  *See People v. Black*, 41 Cal. 4th 799, 805, 62 Cal. Rptr.

23  3d 569, 161 P.3d 1130 (2007) ("*Black II*"); *Butler v. Curry*, 528 F.3d 624, 642 (9th Cir. 2008)

24  (accepting the California Supreme Court's decision in *Black II* as a valid interpretation of

25  California law.  Thus, "if at least one of the aggravating factors on which the judge relied upon

26  in sentencing a defendant was established in a manner consistent with the Sixth Amendment, the

28

defendant's sentence does not violate the Constitution." *Butler*, 528 F.3d at 643.  Once imposition of the upper term is available because of either a prior conviction or an aggravating factor proved beyond a reasonable doubt to a jury, any additional aggravating factors determined by the judge are within his discretion in determining which sentence to impose.  *Id.*

In sentencing Petitioner to the upper term, the trial court relied on, amongst other factors, the fact that Petitioner was on parole at the time he committed the offense.  Lodged Doc. H (Rep.'s Tr. of Sentencing), at 5 ("The fact that defendant was on parole at the time he committed this offense weighs in my mind for justifying this high term.").  Whether the fact that a defendant is on probation at the time he commits another offense may be used to sentence the defendant to the upper term without submitting the question to the jury is an open question.

In *Cunningham* and its predecessors, the Supreme Court has expressly excepted the fact of a prior conviction from being tried to the jury in imposing the upper term. *Cunningham*, 549 U.S. at 281; *Apprendi*, 530 U.S. at 476; *Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999); *see also Blakely*, 542 U.S. at 303.  Lower federal courts, as well as state courts, have offered a variety of interpretations of the prior conviction exception.  For instance, the California Supreme Court has opined that the exception is not to be read "too narrowly."  *Black II*, 41 Cal. 4th at 819. Other state courts have reached similar conclusions.  *See,e.g.*, *State v. Jones*, 159 Wash.2d 231, 149 P.3d 636, 640-41 (2006) ("In our judgment, the prior conviction exception encompasses a determination of the defendant's probation status because probation is a direct derivative of the defendant's prior criminal conviction or convictions and the determination involves nothing more than a review of the defendant's status as a repeat offender."); *State v. Fagan*, 280 Conn. 69, 905 A.2d 1101, 1121 (2006) ("[W]e conclude that the defendant's status as to whether he lawfully had been on release at the time of the offense for which he was convicted . . . was a question that also did not require a jury determination."); *Ryle v. State*, 842 N.E.2d 320, 323-25 (Ind. 2005) (holding that whether the defendant "was on probation when he committed the present offense, a fact reflected in the presentence investigation report," was not a fact that

1    "needs to be proven before a jury"); *State v. Allen*, 706 N.W.2d 40, 48 (Minn. 2005) ("We

2    believe that the fact a defendant is on probation at the time of the current offense arises from, and

3    is so essentially analogous to, the fact of a prior conviction, that constitutional considerations do

4    not require it to be determined by a jury.").  At least three federal circuit courts have suggested

5    that whether a defendant was on probation at the time of the crime is a fact that comes within the

6    prior conviction exception.  *See, e.g.*, *United States v. Corchado*, 427 F.3d 815, 820 (10th Cir.

7    2005) ("[T]he 'prior conviction' exception extends to 'subsidiary findings' such as whether a

8    defendant was under court supervision when he or she committed a subsequent crime."); *United*

9    *States v. Williams*, 410 F.3d 397, 399, 402 (7th Cir. 2005); *United States v. Fagans*, 406 F.3d

10   138, 141-42 (2d Cir. 2005); *see also Butler v. Curry*, 528 F.3d 624, 647 (9th Cir. 2008).  The

11   Ninth Circuit, on the other hand, has interpreted the exception narrowly.  *See Butler*, 528 F.3d at

12   644 ("[W]e have been hesitant to broaden the scope of the prior conviction exception. . . .");

13   *United States v. Kortgaard*, 425 F.3d 602, 610 (9th Cir. 2005) (declining to "extend or broadly

14   construe" the prior conviction exception); *United States v. Tighe*, 266 F.3d 1187, 1194 (9th Cir.

15   2001) (holding that the prior conviction exception "should remain a 'narrow exception' to

16   *Apprendi* " (citing *Apprendi*, 530 U.S. at 490)).

17          Under AEDPA, the writ of habeas corpus can only be granted if the state court

18   unreasonably applied federal law.  28 U.S.C. § 2254(d)(1).  Given the varying interpretations of

19   the prior conviction exception, the state court made a reasonable determination when it

20   concluded Petitioner's parole status made him eligible for the upper term.  *Kessee v.*

21   *Mendoza-Powers*, 574 F.3d 675, 678 (2009) ("[A]lthough a defendant's probationary status does

22   not fall within the "prior conviction" exception, a state court's interpretation to the contrary does

23   not contravene AEDPA standards.")  Petitioner is not entitled to relief on this claim.

24   / / /

25   / / /

26   / / /

5.  Claim V

In Claim V, Petitioner claims that his right to be present for all portions of the

proceedings against him was violated when the court determined that he was not entitled to credit

for the time served while awaiting and undergoing trial.  The California Court of Appeal ruled on

Petitioner's claim as follows:

> Appellant claims he was deprived of his constitutional rights
> because, at a point of time when he was not present in court, the
> trial court denied him presentence credits to which, he asserts, he
> was entitled.
>
> The sentencing hearing in this matter was held, as noted earlier, on
> July 11, 2003. Three days before that date, appellant's trial counsel
> filed a "Defendant's Sentencing Brief" which devoted itself
> principally to arguing against the imposition of the upper term. The
> document did, however, briefly discuss the issue of custody credits
> to which appellant might be entitled, stating: "[O]n the issue of
> credits Mr. POWELL was taken into custody because of a weapon
> found in an automobile which he was driving. His parole status
> alone did not result in his arrest. Thus, the Court should give Mr.
> POWELL the credits to which he was entitled."
>
> This reference in the brief was, clearly, in response to a
> "Pre-Sentence Report" prepared by a deputy probation officer
> which, although marked filed as of July 11, 2003, was in the hands
> of defense counsel before then.FN11 That report recommended
> that appellant receive no custody credits because he was "not
> eligible for these credits in that he was in-custody on a parole hold
> for absconding and not related to the instant offense." Some of
> those last-quoted words appear as underlined, apparently by the
> court, in our copy of the record.
>
>> FN11. We know this because that document is
>> specifically referenced in "Defendant's Sentencing
>> Brief."
>
> At the sentencing hearing, appellant and his counsel were both
> present. The court noted that it had read and considered both
> parties' briefs plus the probation report on the issue of sentencing,
> and asked defense counsel if he had anything he wished to add. He
> did not. The prison sentence, noted above, was then pronounced,
> but in so doing the court said nothing one way or the other
> regarding custody credits. Nor was the subject brought up by either
> counsel thereafter. Both the court's minute order, issued the same
> day, and its abstract of judgment, filed the same day, specifically
> stated that appellant would not receive custody credits.

31

1 Because the issue was not specifically dealt with orally by the court
during the July 11, 2003, hearing, appellant contends the denial of
2 custody credits was done "outside appellant's presence, denying
appellant due process of law and his right to the assistance of
3 counsel." However, it is abundantly clear that the issue of
presentence credits was understood by the parties and the court
4 and, although not verbally dealt with by the court at the July 11,
2003, hearing, it was (1) expressly briefed by both sides before the
5 sentencing hearing, (2) not raised by defense counsel at that
hearing, and (3) expressly determined by the court in its minute
6 order of the same day. We therefore reject the argument that this
issue was considered "outside" of appellant's presence.

7

8 Slip Op. at 16-17.

9      The Sixth Amendment's Confrontation Clause, applied to the states through the

10 Fourteenth Amendment, guarantees a defendant the right to be present in the courtroom at every

11 stage of his trial. *Illinois v. Allen*, 397 U.S. 337, 338 (1970) (citing *Lewis v. United States*, 146

12 U.S. 370 (1892)). In the present case, the Court of Appeal was reasonable when it concluded that

13 Petitioner's right to be present was not violated. Petitioner was given a fair and adequate

14 opportunity to raise the issue of his pre-trial sentencing credits by both filing a sentencing brief

15 and being present during the sentencing hearing. Petitioner's counsel was given the opportunity

16 to make any remarks he wished at the hearing, but chose not to address the issue of whether

17 Petitioner was entitled to credit for the time he served in jail prior to the jury's verdict. At no

18 time was any evidence adduced outside the presence of Petitioner, nor was Petitioner removed

19 from the courtroom during any argument as to his sentence. As such, Petitioner is not entitled to

20 relief on this claim.

21               IV. CONCLUSION

22      For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that the petition for

23 writ of habeas corpus be DENIED.

24      These findings and recommendations are submitted to the United States District Judge

25 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days

26 after being served with these findings and recommendations, any party may file written objections

with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  October 27, 2011

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE

33